**Gloria PRICE, Plaintiff–Appellant,**

v.

**UNITED STATES NAVY; Harry Moses; Marguerite Moses (deceased); Michael Moses; Shirley Moses, Defendants–Appellees.**

No. 93–55447.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 3, 1994.

Decided Nov. 7, 1994.

John H. Reaves, San Diego, CA, for plaintiff-appellant.

Edward Shawaker, David M. Thompson, Andrew C. Mergen, U.S. Dept. of Justice, Washington, DC, for defendant-appellee U.S. Navy.

Before: D.W. NELSON and NOONAN, Circuit Judges, and KING,* District Judge.

SAMUEL P. KING, District Judge:

Gloria Price, the owner of a house resting on a contaminated former landfill, appeals from various orders of the district court in her private action for recovery of response costs under CERCLA[1] and for injunctive relief under RCRA[2] against the United States Navy and Harry Moses. In particular, Price appeals from the orders of the court which (1) dismissed Price's claim under CERCLA for medical monitoring costs, (2) denied Price's claim under CERCLA for attorneys' fees, and (3) dismissed Price's claim for injunctive relief under RCRA which sought to require the Navy to remove allegedly contaminated soil from beneath her house. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm in part and reverse in part.

## FACTS

In the mid–1930's, the United States Navy dumped paints containing lead, copper and zinc, used asbestos gaskets and insulation on a junkyard in Paradise Hills in San Diego, California. The junkyard included what are now 6021, 6025, 6035 and 6045 Edgewater Street, four contiguous properties. The property at 6025 Edgewater was purchased in 1958 by Harry Moses, who built a house on it in 1960. Price eventually came to own the residence at 6025 Edgewater Street.

---

* Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

1. Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., as amended by the 1986 Super-

fund Amendments and Reauthorization Act (SARA), Pub.L. No. 99–499, 100 Stat. 1613 (1986).

2. Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.

In October 1988, Price hired Sylvan Pools, Inc. to construct a pool in the backyard of her home. During the pool excavation Sylvan discovered what it believed to be asbestos in the soil. Sylvan notified the San Diego County Department of Health Services which took samples of the soil and confirmed the presence of asbestos in the front and backyard at 6025 Edgewater. In addition, concentrations of lead above the State TTLC levels[3] were found in samples from 6025 Edgewater. Price moved herself and her family out of her home and into her sister's home for fear of exposure to the contaminants.

In November 1988, Price expended $30,153.56 to remove the large piles of contaminated soil that had been deposited in her yard and her neighbor's yard by Sylvan during the pool excavation. This action was necessitated by an official notice requiring Price to remove the contaminated material.

On July 5, 1989, the State of California, Department of Health Services, Toxic Substances Control Division, determined that the former junkyard site presented an imminent and substantial endangerment to the public health, welfare and the environment. The State based its determination on the fact that the presence of metals, including lead, zinc and copper, and asbestos in the surface soils at the site (6021, 6025, 6035 and 6045 Edgewater) demonstrated that there had been a release of hazardous substances; and that immediate action was necessary to prevent ingestion of contaminants by children, residents and visitors to the site. According to state officials, the contaminants did not present a threat to ground water, surface water or air.

From December 1989 to January 1990, the State undertook a cleanup of the four yards. The State hired International Technologies Corporation ("ITC") to perform the cleanup. ITC's removal and remedial action included excavation down to three feet of the entire back yards and replacement with clean fill.

Concrete was placed along the side yards. In addition, ITC placed new sod in the front and back yards and decorative slabs and a new fence in the back yard of 6025 Edgewater. ITC did not dig under the driveway or home at 6025 Edgewater.

After the cleanup was completed, ITC collected soil samples. A total of six borings were made, some to a depth of approximately 17 feet below ground level at the site. The samples revealed that no contamination remained in any areas of the site. This included a boring taken from beneath the foundation at 6021 Edgewater. No boring or sample was taken from beneath the foundation at 6025 Edgewater.

## PROCEEDINGS BELOW

The instant lawsuit was filed in October of 1989. In her first amended complaint, Price asserted claims against the Navy, the Moses family (former owners of the property) and Sylvan Pools.[4] Price asserted a private cost recovery action under CERCLA to recover the $30,000 spent to remove the contaminated soil unearthed by the pool excavation, as well as attorneys' fees and the costs of "medical bills, including the cost of medical care and testing, tissue sampling, chromosomal testing, epidemiological studies and other assistance." She also sought an injunction under RCRA requiring the defendants to remove the contamination which she asserted was still on the property.[5]

The case was originally assigned to the Honorable Earl B. Gilliam. On October 2, 1992, Judge Gilliam held that the defendants were responsible parties under CERCLA, entitling Price to recover her cleanup costs, while reserving for trial "The amounts or questions of reducing or disallowing private plaintiff total recovery as a result of contribution issues and payments from other sources." The court also held that Price was entitled to recover attorneys' fees.

---

**3.** TTLC means the total threshold limit concentration as defined in the California Code of Regulations, Title 22, Article 11, Section 66696.

**4.** Price and Sylvan settled before trial for $30,000.

**5.** Price also asserted various state law claims against Moses and Sylvan Pools. Those claims are not at issue in this appeal.

The matter was reassigned to the Honorable Irma E. Gonzalez for trial. The case was tried in October over a period of nine days. At trial, Price put on proof as to her private cleanup expenses, relocation expenses, medical monitoring costs, and attorneys' fees, and also sought an injunction under RCRA for future destruction and rebuilding of the Price house. The district court entered a series of four orders relevant to these claims.

On October 21, 1992, the district court held that private "response costs" under CERCLA do not include the cost of medical monitoring to detect the onset of any latent disease caused by exposure to hazardous waste. The court based its decision on the reasoning of *Daigle v. Shell Oil Co.*, 972 F.2d 1527 (10th Cir.1992), which the court found to be persuasive.

On October 22, 1992, the United States brought a motion for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure seeking dismissal of Price's RCRA count. The court verbally granted the government's motion and Price moved for reconsideration. On November 13, 1992, the court entered a written order setting forth its basis for granting the government's motion to dismiss. The court held, after considering the testimony and evidence presented at trial, that Price had failed to meet her burden that an "imminent and substantial endangerment" to health or environment presently exists, and accordingly dismissed Price's RCRA claim against the Navy.[6]

On November 30, 1992, the district court reversed the earlier ruling on attorneys' fees pursuant to the government's motion for reconsideration, holding that Price was not entitled to recover such fees.

Finally, on December 4, 1992, the district court addressed Price's remaining CERCLA claims. The court found the Navy ninety-five percent liable and Moses one percent liable for Price's "response costs."[7] These "response costs" included the $30,000 spent to remove the soil unearthed by Sylvan, and $4,475 incurred by Price and her family for relocation while the cleanup took place. However, the court made an actual award of $0 because under 42 U.S.C. § 9614(b), any person who receives compensation for removal costs pursuant to any other federal or state law is precluded from receiving compensation for the same removal costs under CERCLA. The State had already paid Price $25,000 as reimbursement for the cleanup and associated costs. In addition, Price received $30,000 from the settlement of her claims against Sylvan. The district court determined that these payments were made pursuant to state and/or federal law, and thus awarded Price nothing. Price does not appeal from the decision awarding her $0 net recovery.

## DISCUSSION

### 1. *Failure to Sign Notice of Appeal*

■ The first issue we must address is Price's failure to sign her Notice of Appeal. The original notice filed in this case indicates that Price was appealing in propria persona,[8] and was not signed by Price herself, but by her husband Thomas Price "on behalf of Gloria Price".[9] Thomas Price is not a party to this action and is not an attorney. The Navy asserts that the appeal should therefore be dismissed. We have so held in the past.

In *McKinney v. De Bord*, 507 F.2d 501 (9th Cir.1974), a state prisoner brought a § 1983 action for himself, his mother and another prisoner. His claims were denied by the trial court. The notice of appeal was signed only by the prisoner, although it purported to be on behalf of all plaintiffs. The

---

6. Price had previously agreed to dismiss her RCRA claim against Harry Moses.

7. The other four percent was attributed to Sylvan Pools.

8. Concurrently with the filing of Price's opening brief on appeal, a notice of appearance from John H. Reaves, Esq. was filed. Mr. Reaves represented Price in the district court. Thus, Price is no longer proceeding in propria persona.

9. Price believed that her husband could sign the notice of appeal on her behalf. Declaration of Gloria Price In Support of Appellant's Reply Brief.

court dismissed the appeal as to the mother and the other prisoner "because the notice of appeal must be signed by the party or the party's attorney." *Id.* at 503.

Likewise, the court in *Carter v. Commissioner of Internal Revenue,* 784 F.2d 1006 (9th Cir.1986) dismissed the appeal of a pro se party who failed to sign the joint notice of appeal. The notice was signed only by her husband. The Court reasoned that:

> The only means of determining which litigants are interested in pursuing an appeal is by requiring each pro se party to personally sign the notice of appeal. Imposition of this requirement does not unduly burden the prospective appellant and acts to protect the rights and interests of all parties to the litigation. It is the only practical way to *specify* the party or parties taking the appeal, as required by Rule 3(c) [Fed.R.App.P].

*Id.* at 1008 (quoting *Covington v. Allsbrook,* 636 F.2d 63, 64 (4th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1990, 68 L.Ed.2d 305 (1981)) (emphasis in original).

Price argues that the reasoning of *Carter* does not apply to her case. It is clear from the notice of appeal and other papers that *she* is the only appellant in this case. Thus, there is no confusion and no prejudice to the Navy. In addition, Price cites Rule 11, which states that "An unsigned paper [shall be stricken unless] omission of the signature is corrected promptly after being called to the attention of the attorney or party." Fed. R.Civ.P. Rule 11. Price has resubmitted her Notice of Appeal with her personal signature affixed thereto, and asks this Court to consider this issue moot.

We agree with Price that dismissal of her appeal is not warranted. The Navy has not claimed any confusion because of Price's failure to sign the Notice of Appeal. Price immediately corrected the omission and is permitted to proceed with the appeal.

## 2. CERCLA Claims

### Medical Monitoring Costs

■ Price argues on appeal that she is entitled to recover medical monitoring costs as a "response" cost under 42 U.S.C. § 9607(a)(4)(B). The district court rejected this claim based on the reasoning of *Daigle v. Shell Oil Co.,* 972 F.2d 1527 (10th Cir.1992). *Daigle* is the first Court of Appeals case to address the issue of whether medical monitoring costs are recoverable by private plaintiffs as a necessary "response" under CERCLA.[10]

*Daigle* began its analysis with the statute itself. CERCLA was enacted to facilitate the cleanup of environmental contamination caused by hazardous waste releases. *Id.* at 1533. *See also, 3550 Stevens Creek Assoc. v. Barclays Bank of California,* 915 F.2d 1355, 1357 (9th Cir.1990), *cert. denied,* 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). CERCLA employs several mechanisms to further this purpose. One of those mechanisms is a private action for recovery of response costs. The statute provides that certain responsible parties may be sued for:

> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; [and]
>
> (B) *any other necessary costs of* **response** *incurred by any other person* consistent with the national contingency plan[.]

42 U.S.C. § 9607(a)(4) (emphasis added). The issue, then, is whether the plaintiffs' claim for medical monitoring costs falls within subsection (B)'s private right of recovery for "any other necessary costs of *response.*" 972 F.2d at 1533 (emphasis added). Unfortunately CERCLA does not define the phrase "any other necessary costs of response," although it does define the term "response" as "removal" or "remedial action." 42 U.S.C.

---

**10.** District court cases dealing with this issue have gone both ways. Compare *Coburn v. Sun Chemical Corp.,* 28 ERC 1665, 1988 WL 120739 (E.D.Pa.1988) and *Chaplin v. Exxon Corp.,* 25 ERC 2009, 1986 WL 13130 (S.D.Tex.1986) (med-ical monitoring costs not recoverable) with *Brewer v. Ravan,* 680 F.Supp. 1176 (M.D.Tenn.1988) and *Jones v. Inmont Corp.,* 584 F.Supp. 1425 (S.D.Ohio 1984) (cost of medical monitoring may be recoverable).

§ 9601(25) [11] "Removal" and "remedial action" are further defined.

 ... "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to **monitor,** assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or **the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare** or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for....

42 U.S.C. § 9601(23) (emphasis added).

 ... "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, **and any monitoring reasonably required to assure that such actions protect the pub-**

lic health and welfare and the environment. . . .

42 U.S.C. § 9601(24) (emphasis added). As these definitions indicate, removal actions are designed to effect an interim solution to a contamination problem, while remedial actions are designed to effect a permanent solution. *Daigle,* 972 F.2d at 1533–34.

 The plaintiffs in *Daigle* argued that the definitions' use of the term "monitoring" in the "public health and welfare" context indicates that their claims are covered. The court rejected this argument, stating that plaintiffs, and the cases they had cited to support their argument, went "awry in affording a broad sweep to the 'public health and welfare' language in the definitions." *Id.* at 1535.

 In examining the language of the definitions, the *Daigle* court observed that the context in which the "monitoring" and "health and welfare" language appears is directed at containing and cleaning up hazardous substance releases. The "monitoring" allowed for under "removal" relates only to an evaluation of the extent of a "release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). And the "remedial action" definition expressly focuses only on actions necessary to "prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare." 42 U.S.C. § 9601(23).

 The *Daigle* plaintiffs further argued that the phrase in § 9601(23) (definition of "removal") referring to "other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare" should be read broadly to cover any type of monitoring that would mitigate health problems. *Daigle,* 972 F.2d at 1535. The court rejected this argument as well, stating that the general provision for prevention or mitigation of "damage to the public health or welfare" must be interpreted consistently with the specific examples of "removal costs" enumerated in the definition. *Id.* The spe-

---

**11.** The complete definition of "response" is as follows:

 The terms "respond" or "response" means remove, removal, remedy, and remedial action,

all such terms (including the terms "removal" and "remedial action") include enforcement activities related thereto.

 42 U.S.C. § 9601(25).

cific examples in § 9601(23) are all designed to prevent or mitigate damage to public health by preventing contact between the spreading contaminants and the public. Monitoring long-term health has nothing to do with preventing such contact. *Id.*

The *Daigle* court then noted that its construction of the definition of "response" is supported by legislative history.

Plaintiffs' request for medical monitoring to allow "prevention or early detection and treatment of chronic disease" smacks of a cause of action for damages resulting from personal injury. And the history of the enactment of CERCLA reveals that both houses of Congress considered and rejected any provision for recovery of private damages unrelated to the cleanup effort, including medical expenses.

*Id.*[12] Legislative history also reveals that the deletion of medical expenses from the earlier versions of the bill was purposeful. Senator Randolph, a cosponsor of the bill, stated that "We have deleted the Federal cause of action for medical expenses or income loss." 126 Cong.Rec. § 14964 (daily ed. Nov. 24, 1980). This history convinced the *Daigle* court that "Congress intentionally deleted all personal rights to recovery of medical expenses from CERCLA." 972 F.2d at 1536.

The court finally noted that CERCLA provides elsewhere an elaborate scheme to assess health effects of threatened hazardous substance releases. *Id.* at 1536 (citing § 9604(i), relating to the Agency for Toxic Substances and Disease Registry ("ATSDR"), which is authorized to conduct health assessments, and, if necessary, further pilot studies and a continuous program of medical monitoring in appropriate cases). Congress provided for the funding of ATSDR

studies separate from the payment of response costs. *Id.* at 1537. · Therefore, the *Daigle* court refused to allow plaintiffs' claim for medical monitoring costs.

We agree with the reasoning of the *Daigle* court and likewise hold that medical monitoring costs are not response costs under CERCLA. Price's claim for medical monitoring costs, which she supports with the same arguments advanced by the plaintiffs in *Daigle,* is therefore rejected.

*Attorneys' Fees*

■ Price next challenges the district court's ruling that CERCLA does not provide for recovery of attorneys' fees by private parties. This issue must be remanded to the district court for reconsideration in light of the recent United States Supreme Court case *Key Tronic Corp. v. United States,* —— U.S. ——, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994).[13]

In *Key Tronic,* a private party brought suit against the Air Force and other responsible parties to recover its cleanup costs which included attorney's fees for legal services provided in connection with (1) the identification of other potentially responsible parties ("PRP's"), (2) the preparation and negotiation of a settlement agreement with the EPA, and (3) the prosecution of the litigation. The issue the Court had to decide was whether the "enforcement activities" included in 42 U.S.C. § 9601(25)'s definition of "response" encompass a private party's action to recover cleanup costs from other PRP's such that the attorneys' fees associated with that action are then "necessary costs of response" within § 107(a)(4)(B). *Id.* at ——, 114 S.Ct. at 1965–66. The Court held that attorneys' fees associated with category (1) may be recoverable while those in catego-

---

**12.** The court also cited to the original versions of the House and Senate bills, which both contained provisions for private recovery of damages for personal injury, including medical expenses. H.R. 7020, 96th Cong., 2d Sess., as submitted by Representative Florio on April 1, 1980; S. 1480, 96th Cong., 2d Sess. (1980) U.S.Code Cong. & Admin.News 1980, 6119. The compromise bill which eventually became law contained no reference to medical expenses. H.R. 7020, 96th Cong., 2d Sess., as enacted Sept. 30, 1980. *Id.* at 1536.

**13.** *Key Tronic* was on appeal from the Ninth Circuit, *Key Tronic Corp. v. U.S.,* 984 F.2d 1025 (9th Cir.), *cert. granted,* —— U.S. ——, 114 S.Ct. 633, 126 L.Ed.2d 592 (1993). *See also Stanton Road Associates v. Lohrey Enterprises,* 984 F.2d 1015 (9th Cir.1993) (decided the same day), which held that CERCLA does not authorize an award of attorneys' fees to private litigants as part of response costs incurred in cleaning up property contaminated by hazardous substances, and which provided the basis for the Ninth Circuit's decision in *Key Tronic.*

ries (2) and (3) are not. *Id.* at —, 114 S.Ct. at 1966–67.

The Court refused to allow recovery of attorneys' fees for private parties who seek to recover cleanup costs because recovery of such fees is not expressly provided for in CERCLA, while Congress has included two express provisions in other circumstances, and "it would stretch the plain terms of the phrase 'enforcement activities' too far to construe it as encompassing the kind of private cost recovery action at issue in this case." — U.S. at —, 114 S.Ct. at —. Recovery for identification of PRP's is allowed because those activities may involve the services of persons who are nonlawyers, and thus are not incurred in pursuing litigation. Legal services for negotiating settlement with the EPA are not recoverable because such work primarily protects the private party's interests as a defendant in the proceedings that established the extent of its liability. As such, they are not "necessary costs of response." *Id.* at —, 114 S.Ct. at 1968.

In the instant case, Price presented evidence of attorney's fees to the district court pursuant to the court's original order which held that Price was entitled to recover such fees. The district court later held that Price could not recover any attorney's fees and thus it did not break down the fees according to the categories used by the Supreme Court in *Key Tronic*. The case must therefore be remanded to the district court.

*Joint and Several Liability*

■ Price also contends that the district court erred when it limited the liability of the Navy to 95% and Moses to 1% because "liability is joint and several under CERCLA." This contention can be quickly disposed of because the very cases cited by Price refute her argument. For example, *United States v. Monsanto Co.,* 858 F.2d 160, 173 (4th Cir.1988), *cert. denied sub nom Monsanto Co. v. United States,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), states that "While CERCLA *does not mandate* the imposition of joint and several liability, it permits it in cases of indivisible harm." (Em-

phasis added.) *State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 n. 13 (2d Cir.1985), recognized that the *legislative history* of CERCLA specifically indicates that the question of joint and several liability was to be left to the courts to be addressed in light of the common law. Note also that Price does not argue that the apportionment of fault made by the district court was erroneous. Therefore, this argument is rejected.

*3. RCRA Claim*

Lastly, Price argues that the district court erroneously dismissed her RCRA claim for injunctive relief against the Navy.[14] Price wants the Navy to pay for the cleanup of the soil directly under the foundation of her house. Price's house sits on a slab of cement which has thus far provided protection against exposure to the underlying soil, which was not removed or otherwise remediated during the State's cleanup of the site.

The problem, Price asserts, is that her house has structural problems. The house was apparently built on several feet of uncompacted junkyard fill. As a result, the concrete slab on which the house was built is cracking. Price claims that in order to remedy this problem, she will need to remove the present floor slab and underlying soil, replace the soil with properly compacted fill, and then pour a new concrete floor slab. These actions "will set in motion a chain of events which could cause migration of the contaminants into the environment and ingestion or inhalation of the contaminants, resulting in serious harm." Though Price may have a legitimate concern about the soil under her home, she failed to produce sufficient evidence to support her RCRA claim, and we therefore affirm the district court's dismissal of her claim.

■ The citizen suit provision of RCRA, 42 U.S.C. § 6972(a)(1)(B), provides in pertinent part:

(a) ... any person may commence a civil action on his own behalf ...

(1) ...

(B) against any person including the United States ... who has contributed or who

---

**14.** Recall that Price dismissed her RCRA claim against Moses.

is contributing to the past or present transportation or disposal of any solid or hazardous waste **which may present an imminent and substantial endangerment to health or the environment** ...

... The district court shall have jurisdiction ... to order such person to take such other action as may be necessary....

*Id.* (Emphasis added.) When Congress enacted RCRA in 1976, it sought to close "the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes." H.R.Rep No. 1491, 94th Cong., 2d Sess. 4, *reprinted in* 1976 U.S.C.C.A.N. 6238, 6241. RCRA's waste management requirements for disposal facilities are designed not only to prevent, but also to mitigate, endangerments to public health and the environment. *See id.*

■ A finding of "imminency" does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present: "An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public." *Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 465 F.2d 528, 535 (D.C.Cir.1972) (quoting EPA Statement of Reasons Underlying the Registration Decisions). Imminence refers "to the nature of the threat rather than identification of the time when the endangerment initially arose." *United States v. Price,* 688 F.2d 204, 213 (3d Cir.1982) (quoting H.R.Committee Print No. 96–IFC 31, 96th Cong., 1st Sess. at 32 (1979)).

Moreover, a finding that an activity may present an imminent and substantial harm does not require actual harm. *United States v. Waste Industries, Inc.,* 734 F.2d 159 (4th Cir.1984). Courts have also consistently held that "endangerment" means a threatened or potential harm and does not require proof of actual harm. *United States v. Ottati & Goss, Inc.,* 630 F.Supp. 1361, 1394 (D.N.H.1985); *United States v. Vertac Chemical Corp.* 489 F.Supp. 870, 885 (E.D.Ark.1980). *See also Ethyl Corp. v. EPA,* 541 F.2d 1, 13 (D.C.Cir.) (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976) ("[c]ase law and dictionary definition agree that endanger

means something less than actual harm"). However, at the very least, endangerment or a threat must be shown.

■ In the present case, the district court, ruling upon the Navy's motion for judgment on partial findings pursuant to FRCP Rule 52(c), concluded that there is no imminent or substantial endangerment entitling Price to an injunction. The RCRA provision implies that there must be a threat which is present *now,* although the impact of the threat may not be felt until later. Also, endangerment must be substantial or serious, and there must be some necessity for the action. Price failed to make the requisite showings.

The court discussed the testimony and evidence presented at the trial. That discussion is reproduced here at length:

There is no dispute that 6025 Edgewater is in a residential neighborhood. Although asbestos was found on the site, it was the presence of hazardous levels of lead at 6021 and 6025 Edgewater that caused State officials to be concerned. Moreover, lead rather than asbestos is a listed contaminant under RCRA.

The State invested more than $300,-000.00 to perform a cleanup of the properties located at 6021, 6025, 6035 and 6045 Edgewater. Soil from the front and back yards at 6025 Edgewater was removed to a depth of three feet and replaced with clean fill. Additionally, the side yards were capped with concrete. The purpose of the cleanup was to eliminate the only possible pathway to exposure-ingestion since there was no threat of migration of contaminants through ground or surface water or air.

Although the State found lead contamination in the back yard and asbestos contamination in the front yard at 6021 Edgewater ... tests revealed no significant hazardous contamination beneath the foundation at that address. No testing of the soil underneath the foundation of 6025 Edgewater was performed. The fact that plaintiff Price observed the same sort of debris under the 6021 Edgewater house as under the 6025 Edgewater home does not lead to the logical conclusion that there is contamination under the 6025 residence. Rather,

the opposite conclusion can be drawn. **Moreover, there was no testimony presented regarding interpolations or presumptions as to levels of possible hazardous contamination under the house at 6025 Edgewater.**

Prior to the cleanup, the State determined that soil under the homes at the site or beneath cement or asphalt posed no threat to public health or the environment and would be left undisturbed.... Witnesses for the State testified that concrete slab foundations and driveways act as effective barriers or caps to any possible contamination (Vitale and Scandura testimony). The State's toxicologist, Dr. Levy, agreed that a concrete barrier blocks the only pathway to lead contamination.

Although Mr. Vitale and Mr. Scandura testified that contaminants probably remain underneath the home at 6025 Edgewater, they both agreed that there is no imminent and substantial endangerment at the present time because of the concrete barriers. Moreover, the State certified that all appropriate response actions had been completed and that no further removal/remedial action is necessary....

Under RCRA, the court has jurisdiction "to restrain" or to order "such other action as may be necessary" or "both". In other words, the court can grant affirmative relief, if necessary, to abate an imminent and substantial endangerment. **Here, plaintiffs have failed to meet their burden that an imminent and substantial endangerment to health or environment presently exists.**

Plaintiffs argue that necessity is not a requirement for this court to order abatement under RCRA. Plaintiffs rely on testimony that there continues to be contami-

nation underneath the foundation and that plaintiffs cannot make repairs, renovations or upgrades without disturbing the concrete slabs and causing a release. This would also constitute a violation of the deed restrictions.[15]

**The court is not convinced that, even if contaminants remain beneath the house, that the levels of contaminants are hazardous. In addition, repairs and/or renovations might not cause a release.** Mr. Vitale testified that the State knew before its cleanup about the cracks in the slab and did not think they were significant.[16]

Plaintiffs assert that they have lost all equity in their property, that no bank will lend money with the property as security and that plaintiffs will never be able to sell the home. However, plaintiffs offered absolutely no evidence to support this contention.[17]

This court concludes that there is no imminent nor substantial endangerment and that there is no necessity for an abatement order. Whatever threat existed prior to the cleanup has been eliminated. No further action is needed now nor may any action ever be needed to abate contamination....

Price claims the district court, as a matter of law, misapplied RCRA when it dismissed her claim on the ground that there is *presently* no threat. Price apparently is arguing that the threat will arise when she attempts to repair the foundation of her house. Price's argument hinges on two findings of fact of the district court: (1) that there are no hazardous contaminants under the house, and (2) that a repair of the foundation will not cause a release.

---

**15.** In her reply brief, Price argued that the deed restrictions constitute a taking by the Navy. This issue was not raised below, and will not be considered here. At any rate, it was the State, and not the Navy, which imposed the deed restrictions on the property at 6025 Edgewater.

**16.** In the Memorandum Decision and Order in this case, the court observed that "Mr. Vitale became aware of cracks in the slab in the home at 6025 Edgewater, specifically, cracks in the living room and bathroom. According to Mr.

Vitale, the cracks can be repaired without disturbing the foundation of the home. He feels no exposure will be created by filling the cracks. In fact, soil and dust discovered in the crack in the bathroom tested negative for contaminants."

**17.** Price's declaration in support of her motion for leave to proceed on appeal in forma pauperis contained statements regarding her inability to obtain a loan on her property or sell her property. This information was not presented below and will not be considered on appeal.

In reviewing a judgment following a bench trial, this court reviews the district court's findings of fact for clear error and its legal conclusions de novo. *Tonry v. Security Experts, Inc.*, 20 F.3d 967, 970 (9th Cir.1994). The same standard applies to the district court's involuntary dismissal of a claim under Rule 52(c). *Id.; Stone v. Millstein,* 804 F.2d 1434, 1436–37 (9th Cir.1986) (construing Rule 52(c)'s predecessor Rule 41(b)).

As the district court noted, Price failed to show that there is a hazardous level of contamination under her foundation. No testing of the soil directly under Price's house was done. In addition, testing of the soil found in the cracks of the foundation tested negative for contaminants. Thus, we cannot say that it was clear error for the district court to find that the soil under Price's house is probably like the soil under the 6021 Edgewater house, which did not contain significant hazardous contaminants.

Price also failed to show that she needed to remove the concrete slab in order to prevent further harm to her house and foundation. Price has not pointed to any evidence which contradicts the testimony of Mr. Vitale who stated that the cracks in the concrete slab could be repaired without disturbing the foundation and underlying soil. We therefore affirm the district court's dismissal of Price's RCRA claim.

## CONCLUSION

We affirm the district court except with respect to attorney's fees. In light of the United States Supreme Court's decision in *Key Tronic Corp. v. United States,* —— U.S. ——, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), the district court must reconsider the issue of whether any of the attorney's fees sought by Price were for services provided in connection with the identification of other potentially responsible parties.