**AVONDALE FEDERAL SAVINGS BANK, Plaintiff,**

v.

**AMOCO OIL COMPANY, a Maryland corporation, Defendant.**

No. 96 C 2762.

United States District Court, N.D. Illinois, Eastern Division.

March 19, 1998.

William M. McErlean, Howard L. Teplinsky, Julie Ann Garvey, Seidler & McErlean, Chicago, IL, Ann T. Parisi, Maureen Martin, Johnine J. Brown, BrownMartin, P.C., Chicago, IL, Sheila H. Deely, Brown & Martin, P.C., Chicago, IL, for Plaintiff.

Vincent S. Oleszkiewicz, Michael J. Wagner, David P. Hackett, Matthew G. Allison, Baker & McKenzie, Chicago, IL, Peter James Gillespie, Baker & McKenzie, Chicago, IL, for Defendant.

## OPINION AND ORDER

NORGLE, District Judge.

Before the court is Defendant Amoco Oil Company's Motion for Summary Judgment. For the following reasons, Defendant's motion is granted in part, and denied in part.

## I. BACKGROUND [1]

Plaintiff, Avondale Federal Savings Bank ("Avondale"), filed a Second Amended Complaint for Declaratory Judgment and Other Relief against Amoco Oil Company ("Amoco"). In Counts I and II, brought pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972, Avondale seeks: (1) recovery of the cleanup costs it incurred investigating and remediating solid or hazardous waste at 300 East Illinois Road, Lake Forest, Illinois ("Property"); and (2) an order requiring Amoco to undertake at its expense "any future action that may be required for residual on-site contamination caused by Amoco's USTs [underground storage tanks] or for contamination that migrated off-site from them." (Pl.'s Resp. at 5.) In Counts III and IV, brought pursuant to state common law, Avondale seeks recovery of the cleanup costs it incurred investigating and remediating solid or hazardous waste at the Property.

From approximately November 19, 1926, to June 26, 1970, Amoco owned a gasoline service station located on the Property. In 1970, Amoco razed the gasoline service station, including all buildings, driveways, and approaches. On June 26, 1970, Amoco transferred the Property via warranty deed to George W. and Margaret M. Herman ("Hermans") who owned the Property from approximately June 26, 1970, to January 2, 1975. On January 2, 1975, the Hermans transferred the Property via warranty deed to First National Bank of Lake Forest ("First National") who owned the Property from approximately January 2, 1975, to July 1, 1975. On July 1, 1975, First National transferred the Property via warranty deed to Lake Forest Savings and Loan Association ("Lake Forest"). In December of 1982, Lake Forest merged into Avondale, and Avondale acquired title to the Property. Avondale then improved the Property with a parking lot and a building, and used it as a bank.

In late 1995, in anticipation of selling the Property, Avondale conducted an environmental investigation of the Property. Boelter Environmental Consultants ("Boelter") on November 17, 1995, and EPS Environmental Services, Inc. ("EPS") on April 18, 1996, performed soil borings on the Property. The soil borings allegedly showed that there was petroleum contamination in the Property's soil at concentrations exceeding Illinois' cleanup objectives.

On January 22, 1996, pursuant to RCRA's mandatory notice provision, 42 U.S.C. § 6972(b)(2)(A), Avondale served Amoco with a 90–day "Notice of Endangerment and Notice of Intent to Sue" ("90–day notice") for contributing to petroleum contamination on the Property that may present an imminent and substantial endangerment. Avondale also notified the necessary governmental officials and agencies pursuant to RCRA's mandatory notice provision to give them an opportunity to file a civil action against Amoco; the governmental officials and agencies did not choose to do so.

On January 29, 1996, Avondale entered into a Purchase and Sale Agreement with First Chicago Building Corporation ("First Chicago") to sell the Property. As a condition of the purchase of the Property, First Chicago required Avondale to deliver the

---

**1.** The following facts are taken from the court's reconciliation of the parties Local Rule 12(M) and 12(N) statements.

Property in a clean condition without any contamination and a "No Further Remediation Letter" from the Illinois Environmental Protection Agency ("IEPA").

On February 12, 1996, Amoco acknowledged receiving the 90–day notice and requested the environmental records and reports referenced in the 90–day notice; Amoco did not concede any liability or offer to remediate any alleged contamination. Avondale promptly provided the requested records and reports to Amoco.

On March 15, 1996, EPS discovered three USTs allegedly full of gasoline and water; strong petroleum odors allegedly emanated from the soils surrounding the USTs. EPS also allegedly discovered miscellaneous piping, a 45–gallon hydraulic oil reservoir, and a rectangular concrete containment structure on the Property.

On March 25, 1996, Amoco requested additional information. Amoco, however, did not volunteer to investigate or remediate the alleged contamination, but requested Avondale to perform additional tests and provide complete chemical analyses of specified petroleum markers. Avondale undertook the requested chemical analyses and provided the results on May 9, 1996.

On May 8, 1996, Avondale filed its original Complaint against Amoco. The 90–day notice period had expired in late April without any acknowledgment of liability or offer by Amoco to perform the necessary remediation of the alleged contamination. Amoco did, however, request to participate in the excavation of the USTs and sampling process.

After Amoco allegedly refused to remediate the alleged endangerment caused by leaking USTs, Avondale allegedly informed Amoco that it was undertaking remediation and would hold Amoco responsible for the costs. Avondale entered a voluntary cleanup program offered by IEPA under which IEPA provided oversight and approval of Avondale's remediation plan.

On May 21, 1996, three USTs and associated piping, as well as the 45–gallon hydraulic oil reservoir were uncovered, pumped free of gasoline and water, excavated, cleaned, and transported off the Property. Soil remediation was completed in late 1996. Avondale has remediated the Property to the most stringent standards established by IEPA, the "Tier I Residential Cleanup Objectives."

On November 20, 1996, IEPA issued a "No Further Remediation Letter" ("IEPA Letter"). The IEPA Letter states that IEPA reviewed the "Remedial Action Completion Report" for the Property and that the remedial action was completed in accordance with the "Remedial Action Plan." The IEPA Letter further states that its issuance "signifies a release from further responsibilities under the [Illinois Environment Protection] Act in performing the approved remedial action and shall be considered prima facie evidence that the remediation site ... does not constitute a threat to human health and the environment and does not require further remediation under the Act." (Def.'s 12(M) Stmt. at Ex. C.)

On November 22, 1996, Avondale transferred the Property to First Chicago. Accordingly, Avondale seeks recovery of the cleanup costs it incurred after properly invoking RCRA's statutory process. In addition, Avondale seeks an order requiring Amoco to remediate at its expense any future residual contamination on the Property or off-site migration of contamination therefrom. Avondale maintains that "[i]f excavation is ever performed under the streets adjacent to the Lake Forest Property, petroleum contamination will be found at levels requiring abatement to protect human health and the environment." (Pl.'s 12(N) Stmt. at ¶ 57.) Amoco moves for summary judgment.

## II. DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is genuine only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir.1997) (*quoting Newell v. Westinghouse Elec. Corp.*,

36 F.3d 576, 578 (7th Cir.1994)) (citation omitted).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When considering all the evidence presented in a motion for summary judgment, a court cannot make credibility determinations. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must "view the record and all reasonable inferences drawn from the record in the light most favorable to the non-moving party." *Sample v. Aldi, Inc.,* 61 F.3d 544, 546 (7th Cir.1995).

"If the non-moving party bears the burden of proof on an issue, that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact." *Id.* at 547. "[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *Severn,* 129 F.3d at 427 (citations and internal quotation marks omitted). The non-moving party, therefore, will not survive summary judgment with merely a scintilla of evidence supporting its position. *See Essex v. United Parcel Serv. Inc.,* 111 F.3d 1304, 1308 (7th Cir.1997).

"The question is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Severn,* 129 F.3d at 427. Accordingly, "if the evidence presented by the parties is subject to conflicting interpretations, or if reasonable minds could differ as to its significance," summary judgment must not be granted. *O'Connor v. Chicago Trans. Auth.,* 985 F.2d 1362, 1366 (7th Cir.1993).

### A. RCRA Claims

The citizen suits provision of RCRA states, in relevant part, that a citizen suit may be brought against any "past or present owner or operator of a . . . facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment. . . ." 42 U.S.C. § 6972(a)(1)(B). When a citizen suit is brought pursuant to § 6972(a)(1)(B), the District Court has jurisdiction: "[1] to restrain any person who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B); [2] to order such person to take such other action as may be necessary; or [3] both. . . ." 42 U.S.C. § 6972(a).

In this case, Avondale seeks: (1) recovery of cleanup costs it incurred after properly invoking RCRA's statutory process ("restitution"); and (2) an order requiring Amoco to remediate at its expense any future residual contamination on the Property or off-site migration of contamination therefrom ("injunction"). With respect to the restitution sought, Amoco argues that it is entitled to summary judgment because RCRA does not authorize the recovery of cleanup costs incurred after properly invoking RCRA's statutory process. With respect to the injunction sought, Amoco argues that it is entitled to summary judgment because Avondale cannot show that an imminent and substantial endangerment to health or the environment currently exists.

### 1. Restitution

Recently, the Supreme Court held that "a private party cannot recover the cost of a past cleanup effort under RCRA." *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 116 S.Ct. 1251, 1256, 134 L.Ed.2d 121 (1996). The Supreme Court, however, left open for the lower courts to determine whether a private party could recover cleanup costs incurred after properly commencing a RCRA citizen suit or invoking RCRA's statutory process. *Id.* Here, the court is asked to determine the issue the Supreme Court left open. In so doing, the court relies on the Supreme Court's opinion in *Meghrig. Id.* Although the *Meghrig* opinion was in the context of past cleanup costs, incurred before properly invoking RCRA's statutory process, the reasoning behind the Supreme Court's decision in *Meghrig* is equally applicable here. *See Agric. Excess and Surplus Ins.*

*Co. v. A.B.D. Tank & Pump Co.,* No. 95 C 3681, 1996 WL 515088, at *2 (N.D.Ill. Sept.6, 1996); *Andritz Sprout–Bauer, Inc. v. Beazer East, Inc.,* 174 F.R.D. 609, 618 (M.D.Pa. 1997).

In *Meghrig,* the Supreme Court concluded that costs for past cleanup efforts are not recoverable under RCRA for two reasons: (1) § 6972(a)(1)(B) permits a citizen suit if there is "an imminent and substantial endangerment to health or the environment" ("timing requirement"); and (2) § 6972(a) sets forth two remedies the District Court is authorized to provided in a suit brought pursuant to § 6972(a)(1)(B) ("remedy requirement"). *See Meghrig,* 116 S.Ct. at 1254. Based on the latter reason, remedy requirement, the court concludes that a private party cannot recover cleanup costs incurred after properly invoking RCRA's statutory process. *See Agric. Excess,* 1996 WL 515088, at *2 ("[U]nder the Supreme Court's reasoning in *Meghrig,* this Court feels compelled to find that Plaintiff's also may not recover cleanup costs incurred after the invocation of RCRA's statutory process."); *Andritz,* 174 F.R.D. at 618 ("No framework has been provided by Congress for pursuing a private right of action for costs [incurred after invoking RCRA's statutory process], a clear signal that Congress did not intend to create such a cause of action."). *But see PMC, Inc. v. Sherwin–Williams Co.,* No. 93 C 1379, 1997 WL 223060, at *13 (N.D.Ill. April 29, 1997) ("While it is clear from the case law that restitutionary relief for completed remediation efforts is not available, [citation omitted], there is no prohibition against recovery relating to contamination that has not been abated.").

Pursuant to § 6972(a), Congress authorized the District Court to order "a mandatory injunction, i.e., one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one that 'restrains' a responsible party from further violating RCRA." *See Meghrig,* 116 S.Ct. at 1254; *see also* 42 U.S.C. § 6972(a). Congress did not expressly authorize the District Court to award cleanup costs. *Cf. id.* If Congress so intended, "it knew how to pro-

vide for the recovery of cleanup costs, and ... the language used to define the remedies under RCRA does not provide that remedy." *See Meghrig,* 116 S.Ct. at 1255.

As the Supreme Court noted in *Meghrig,* a comparison between the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") and RCRA is telling. *Id.* 116 S.Ct. at 1253–54. CERCLA was enacted several years after RCRA to address many of the same toxic waste problems addressed by RCRA. *Id.* at 1254. CERCLA was "designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." *Id.* at 1254. In order to achieve that purpose, Congress expressly provides for the recovery of cleanup costs in CERCLA. *Id.* at 1255.

RCRA, on the other hand, was designed " 'to minimize the present and future threat to human health and the environment' " and not to function as a "cost-recovery mechanism." *Id.* at 1254–55. As such, Congress did not expressly provide for the recovery of cleanup costs in RCRA nor intend to do so. *Cf. id.* at 1255; *see also* 42 U.S.C. § 6072(a). In *Meghrig,* the Supreme Court noted that "RCRA's enforcement scheme strongly support[ed]" its conclusion that RCRA does not authorize recovery of past cleanup costs. *Id.* at 1255. Specifically, the Supreme Court noted that "[u]nlike CERCLA, RCRA contains no statute of limitations ... and it does not require a showing that the response costs being sought are reasonable." *Id.* (citations omitted). Similarly, the absence of these provisions support the conclusion that RCRA does not authorize the recovery of cleanup costs incurred after properly invoking RCRA's statutory provisions. *See Agric. Excess,* 1996 WL 515088, at *3.

In addition, under RCRA, a citizen suit can only be brought if the Environmental Protection Agency and the State choose not to commence and prosecute a separate enforcement action. *See Meghrig,* 116 S.Ct. at 1255; *see also* 42 U.S.C. §§ 6972(b)(2)(B), (b)(2)(C). Hence, if RCRA authorized the recovery of past cleanup costs, only "[t]hose parties with insubstantial problems, problems that neither the State nor the Federal Government feel

compelled to address, could recover their response costs, whereas those parties whose waste problems were sufficiently severe as to attract the attention of Government officials would be left without a recovery." *Meghrig*, 116 S.Ct. at 1255. Thus, the Supreme Court concluded that RCRA "would be a wholly irrational mechanism" for compensating for past cleanup costs because only parties cleaning up insubstantial waste problems could recover. *Id.*

Similarly, the court concludes that the RCRA "would be a wholly irrational mechanism" for compensating cleanup costs incurred after properly invoking RCRA's statutory process since only a party cleaning up "insubstantial" waste problems [2] could recover. *Cf. id.* To illustrate the irrationality, Party A needs to cleanup Site A. Party A invokes RCRA's statutory process, and the Government decides not to intervene (an insubstantial waste problem). As a result, Party A can begin immediately thereafter to remediate the contamination and recover its costs from the responsible party. Consequently, Party A would have the option to begin the remediation process right away and recover its cleanup costs. In other words, Party A would not be required to wait until it wins its citizen suit.

By contrast, Party B needs to cleanup Site B. Party B invokes RCRA's statutory process, and the Government decides to intervene (a substantial waste problem). As a result, Party B would not incur any costs since it would be presumably incumbent upon the intervening Government officials to prosecute a separate enforcement proceeding against the responsible party. Consequently, Party B would be in the same position as if RCRA did not authorize recovery of clean-up costs. In other words, even if RCRA authorized recovery of cleanup costs, Party B would be required to wait until the Government wins its enforcement suit before any remediation of the alleged contamination can take place.

It is doubtful that Congress designed RCRA to allow Party A, cleaning up insubstantial waste problems, to recover cleanup costs incurred after properly invoking RCRA's statutory process while precluding Party B, cleaning up substantial waste problems, from recovering such costs. Furthermore, if RCRA authorized the recovery of cleanup costs incurred after invoking RCRA's statutory process, it would undermine the methodology that Congress employed to safeguard human health and the environment. *Cf. id.* 116 S.Ct. at 1254 (RCRA's primary purpose is to "minimize the present and future threat to human health and the environment.").

As the above illustration shows, if RCRA provides recovery of cleanup costs, Party A, remediating an insubstantial waste problem, can begin remediation immediately after invoking RCRA's statutory process and then recover its cleanup costs after the conclusion of its citizen suit. By contrast, Party B, remediating a substantial waste problem, would have to wait for the Government to win its enforcement suit before any remediation can take place. As a result, Party A's waste problem would be remedied faster than Party B's waste problem. It is unlikely that Congress intended to safeguard human health and the environment by employing a methodology that results in cleaning up insubstantial waste problems faster than substantial waste problems.[3]

---

2. For purposes of the hypothetical, whether a waste problem is characterized as "substantial" or "insubstantial" is to connote whether the Government intervenes after receiving notice of the problem. *See* 42 U.S.C. § 6972(b)(2)(A) (before a citizen suit can be brought pursuant to RCRA, the Environmental Protection Agency and the State must be given an opportunity to file a civil action against the responsible party). An "insubstantial" waste problem is one that "neither the State nor the Federal Government feel compelled to address." *Meghrig*, 116 S.Ct. at 1255. A "substantial" waste problem is one that the Government does feel compelled to address. *Cf. id.*

3. The court assumes that Government intervention is more likely where a site is more dangerous to human health and the environment. That assumption was apparently shared by the Supreme Court in *Meghrig* when it used the terms "substantial" and "insubstantial" to conclude that RCRA "would be a wholly irrational mechanism" for compensating for past cleanup costs because only parties cleaning up insubstantial waste problems could recover. *See* 116 S.Ct. at 1255.

Accordingly, based on the "limited remedies described in § 6972(a), along with the stark differences between the language of that section and the cost recovery provisions of CERCLA," the court concludes that RCRA "would be a wholly irrational mechanism" for compensating cleanup costs incurred after properly invoking RCRA's statutory process. *Cf. id.* 116 S.Ct. at 1255–56; *see also Express Car Wash Corp. v. Irinaga Bros., Inc.,* 967 F.Supp. 1188, 1194 (D.Or. June 4, 1997) ("[T]he Supreme Court's logic in *Meghrig* indicates that, if squarely faced with the question at issue here, it would hold that RCRA does not allow a plaintiff to recover any costs for remediation substantially in place at the time of suit."); *Orange Environment, Inc. v. County of Orange,* 923 F.Supp. 529, 539 (S.D.N.Y.1996) ("[T]he [*Meghrig* ] opinion suggests that the Court would be reluctant to read into the RCRA remedies not clearly provided by Congress."); *cf. AM Int'l, Inc. v. Datacard Corp., DBS, Inc.,* 106 F.3d 1342, 1348 (7th Cir.1997) (*citing Meghrig,* 116 S.Ct. at 1251 (RCRA does not allow a party to clean up site and sue for response costs in lieu of seeking an injunction)); *Nutrasweet Co. v. X–L Eng'g Corp.,* 926 F.Supp. 767, 771 (N.D.Ill.1996) (J. Norgle) (This court opined that there is no private right of action under RCRA for the recovery of investigation and remediation costs, and that the plaintiff would have to seek such costs by bringing a state law tort claim.).

Avondale argues that such an interpretation results in a RCRA that is " 'a wholly irrational mechanism—and a wholly ineffective and unfair one—if a defendant like Amoco were to be allowed to escape its statutory duties and responsibilities simply by manipulating the RCRA process to evade them.' " (Pl.'s Resp. at 16.) This, however, is not the case. Under the courts interpretation of RCRA, a defendant like Amoco, assuming it is the responsible party, would not escape its statutory duties and responsibilities since a plaintiff like Avondale is entitled to bring a citizen suit to enforce remediation of the alleged contamination. *See Meghrig,* 116 S.Ct. at 1254; *see also* 42 U.S.C. § 6972(a). Concluding that RCRA does not authorize the recovery of cleanup costs merely confirms that plaintiff cannot "clean up [a] site and sue for response costs in lieu of seeking an injunction." *Cf. AM Int'l. Inc.,* 106 F.3d at 1348 (*citing Meghrig,* 116 S.Ct. at 1251). Moreover, if plaintiff chooses to clean up the site in lieu of seeking an injunction, it can still pursue its cleanup costs against the responsible party under other federal or state laws. *See Meghrig,* 116 S.Ct. at 1256.

Therefore, the court grants Amoco's motion for summary judgment to the extent that Avondale seeks recovery of the cleanup costs it incurred after properly invoking RCRA's statutory process.

### 2. *Injunction*

Section 6972(a)(1)(B) provides that a citizen suit may be brought only upon showing that the solid or hazardous waste involved "may present an imminent and substantial endangerment to health or the environment." *See also Meghrig,* 116 S.Ct. at 1255. "The meaning of this timing restriction is plain: An endangerment can only be 'imminent' if it 'threaten[s] to occur immediately.' " *Id.* (citation omitted). " '[T]here must be a threat which is present now, although the impact of the threat may not be felt until later.' " *Id. (citing Price v. United States Navy,* 39 F.3d 1011, 1019 (1994)).

Avondale argues that it is entitled to an order compelling Amoco to remediate at its expense any future residual contamination on the Property or off-site migration of contamination therefrom. According to Avondale, "[c]ontamination from Amoco's USTs is known to have migrated from the Property under adjacent streets, but it was not remediated as part of Avondale's abatement because IEPA did not require it." (Pl.'s Resp. at 27.) Additionally, Avondale asserts that "[i]f and when adjacent properties are excavated or otherwise disturbed, they will be found to be contaminated by petroleum from Amoco's USTs at level requiring abatement." *Id.* Therefore, Avondale argues that it is "entitled to injunctive and declaratory relief against Amoco … for contributing to existing off-site contamination that may in the future cause danger serious enough to require abatement." *Id.*

■ The court need not go any further than Avondale's own evidence and arguments to conclude that there is no imminent and substantial endangerment to human health or the environment. Avondale states that it seeks an order compelling Amoco to remediate at its expense "contamination that may in the future cause danger serious enough to require abatement." *Id.* There is no evidence to show that there exists any solid or hazardous waste that causes endangerment to human health or the environment now. *See Meghrig,* 116 S.Ct. at 1255 (*citing Price,* 39 F.3d at 1019).

This conclusion is further supported by IEPA's issuance of a "No Further Remediation Letter." The IEPA Letter states that its issuance "signifies a release from further responsibilities under the [Illinois Environment Protection] Act in performing the approved remedial action and shall be considered prima facie evidence that the remediation site [the Property] ... does not constitute a threat to human health and the environment and does not require further remediation under the Act." (Def.'s 12(M) Stmt. at Ex. C.)

Therefore, the court grants Amoco's motion for summary judgment to the extent that Avondale seeks an order compelling Amoco to remediate some future endangerment Amoco allegedly caused. *See also Foster v. United States,* 922 F.Supp. 642, 662 (D.D.C.1996) ("While there can be no question that the levels of contamination present at the Site may warrant future response action, the plaintiff cannot establish either a current risk of 'substantial or serious' threatened harm, or 'some necessity for action.'").

B. State Common Law Claims

■ Although the court concludes that RCRA does not authorize the recovery of cleanup costs incurred after properly invoking RCRA's statutory process, "RCRA does not prevent a private party from recovering its cleanup costs under other federal or state laws." *Meghrig,* 116 S.Ct. at 1256. However, having granted summary judgment for Amoco on Avondale's RCRA claims, the court declines to exercise supplemental jurisdiction over Avondale's state common law claims. *See* 28 U.S.C. § 1367(c); *see also*

*City of Chicago v. Intern. College of Surgeons,* —— U.S. ——, ——, 118 S.Ct. 523, 533, 139 L.Ed.2d 525 (1997) (stating that pendent jurisdiction is a matter of discretion); *Van Harken v. City of Chicago,* 103 F.3d 1346, 1354 (7th Cir.1997) (noting presumption against retention of supplemental state law claims); *Khan v. State Oil,* 93 F.3d 1358, 1366 (7th Cir.1996) (same), *vacated on other grounds* —— U.S. ——, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *Vukadinovich v. Bd. of School Trustees of Michigan,* 978 F.2d 403, 415 (7th Cir.1992) ("It is well established that if federal claims are dismissed before trial, the federal district courts should generally dismiss the state law claims as well."); *Wright v. Associated Ins. Co., Inc.,* 29 F.3d 1244, 1251–53 (7th Cir.1994) (same, but noting three exceptions). Therefore, the court dismisses Counts III and IV, and denies Amoco's motion for summary judgment as to these counts.

### III.  CONCLUSION

For the foregoing reasons, the court grants Amoco's motion for summary judgment as to Counts I and II, and dismisses Counts III and IV. Case is terminated.

IT IS SO ORDERED.