**HANFORD DOWNWINDERS COALITION, INC.,** a nonprofit corporation, on its own behalf and on behalf of its members; **Beatrice A. Christoph; Kathi Steinke;** and **Gloria D. Tinder,** as individuals, Plaintiffs–Appellants,

v.

Dr. **Walter DOWDLE,** in his capacity as Administrator of the Agency for Toxic Substance and Disease Registry; and Agency for Toxic Substances and Disease Registry, an agency of the United States, Defendants–Appellees.

No. 94–35100.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 18, 1995.

Decided Dec. 7, 1995.

Tom H. Foulds, Tom H. Foulds & Associated Counsel, Seattle, Washington, for plaintiffs-appellants.

Elizabeth Ann Peterson, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for defendants-appellees.

Before: FARRIS, NOONAN and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

The Hanford Downwinders Coalition ("HDC") and private plaintiffs appeal the district court's decision to dismiss their request for injunctive relief against defendants-appellees Dr. Walter Dowdle, Administrator of the Agency for Toxic Substances and Disease Registry ("ATSDR"), and the ATSDR. The lower court dismissed the HDC's claim for lack of subject matter jurisdiction and for failure to state a claim based on the Timing of Review provision of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). *See* 42 U.S.C. § 9613(h) (1988). We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

## I. FACTS

This case concerns the federal government's continuing efforts to clean up hazardous waste at the Hanford Nuclear Reservation ("Hanford") in Richland, Washington. Beginning in 1943 as part of the Manhattan Project and continuing for approximately thirty years, Hanford produced plutonium for use in this country's national defense program. The production of nuclear materials at Hanford led to the release of radioactive iodine–131 and other hazardous materials into the region's atmosphere, soil, and water.[1] While it has been established that the releases exposed thousands of people in the Pacific Northwest to radioactive iodine, the

---

1. The Hanford site is now part of the Department of Energy and is operated by private contractors. None of Hanford's nine nuclear reactors is currently active.

effects of the releases on the health of those exposed have yet to be determined.

In 1988, the Environmental Protection Agency ("EPA") proposed adding Hanford to the National Priorities List ("NPL"), which ranks the most serious hazardous waste sites across the country. The proposed listing of Hanford on the NPL triggered intra-agency and intra-governmental efforts to formulate a comprehensive cleanup plan for the site. In May, 1989, the EPA, the Department of Energy, and the Washington State Department of Ecology detailed their plans for the cleanup of Hanford in a Federal Facility Agreement and Consent Order ("FFA" or "Agreement"). The FFA not only outlined the goals of the cleanup, but also included an Action Plan detailing how the Agreement was to be implemented.

The Action Plan summarized the specific responsibilities assigned to the ATSDR. The Plan noted that:

CERCLA requires ATSDR to conduct a health assessment within one year following proposal to the NPL for any site proposed after October 17, 1986.

The ATSDR health assessment is the result of the evaluation of data and information on the release of hazardous substances into the environment. Its purpose is to assess any current or future impacts on public health, to develop health advisories or other health recommendations, and to identify studies or actions needed to evaluate and mitigate or prevent adverse human health effects.

The ATSDR will prepare a preliminary health assessment for each of the four Hanford NPL areas.... [T]hese preliminary health assessments will be based on the best available information.

As additional information becomes available, and as appropriate, ATSDR may, at its discretion, expand these preliminary health assessments into full health assessments adding to the overall characterization of the site, or prepare addenda to the health assessments addressing the public health impact of either individual or a combination of operable units at the site.

The ATSDR completed its preliminary draft assessments of the Hanford site in October of 1989, shortly after the EPA formally listed Hanford on the NPL. The draft assessments concluded that because "information is insufficient to adequately assess the public health concerns associated with ... the Hanford site," on-site and off-site environmental monitoring should be continued. The ATSDR would, "[a]s appropriate, ... continue to follow the results of ... relevant studies and reevaluate Hanford for any indicated follow-up."

Since the release of the ATSDR's preliminary health assessments, the Hanford site has been the subject of continued health related research. In September 1993, the ATSDR identified Hanford as among the Superfund sites posing the most serious threat to public health in the country. *See Hanford Downwinders Coalition, Inc. v. Dowdle*, 841 F.Supp. 1050, 1054 (E.D.Wash.1993) (citing the ATSDR's assessment).[2] In 1994, the Centers for Disease Control released the results of a four-year, $23 million study designed to establish the magnitude of radioactive releases at Hanford.[3] The ATSDR has applied the results of that study to its criteria for determining the appropriateness of medical monitoring activity and presented its analysis to the Hanford Health Effects Subcommittee.[4] In addition, a substantial study designed to assess the effects of the radioac-

**2.** Three Hanford cleanup sites have been identified as among the four CERCLA sites posing the most serious threats to human health. *Hanford Downwinders Coalition*, 841 F.Supp. at 1054 (citing ATSDR site rankings).

**3.** Plaintiffs note that the CDC study "has advanced into a further phase in which the geographical scope of exposure and years of exposure studied have been greatly expanded, along with an increase in the number of radionuclides studied."

**4.** The CDC study has also served as a foundation for other ATSDR efforts. *See More Hanford Health Studies May Be Held; Agency Also Wants to Launch Effort to Track Down Thousands of Downwinders*, The (Spokane) Spokesman Review, March 18, 1995, at B1 (noting that the ATSDR is proposing a review of the CDC study, a study of cancer and birth rates in southeastern Washington, and "an effort to locate thousands of downwinders and monitor their health problems").

tive releases on the health of those exposed is expected to be completed by 1997.

The ATSDR has also participated in several public meetings concerning its health related activities. In the past year, the possibility of beginning an ATSDR medical monitoring program in the region surrounding Hanford has specifically been discussed on at least three separate occasions. *See* 60 Fed. Reg. 35750–01 (July 11, 1995) (meeting in Pasco, Washington); 60 Fed.Reg. 19263–02 (April 17, 1995) (meeting in Portland); 60 Fed.Reg. 12769–01 (March 8, 1995) (meeting in Spokane).[5]

In July 1993, the plaintiffs filed suit in federal district court seeking injunctive relief against the ATSDR. The plaintiffs alleged that the ATSDR has a mandatory duty under CERCLA § 9604(i)(9) to begin a health surveillance program in the Hanford region. The requested injunction would order the ATSDR to initiate § 9604(i)(9) health surveillance activity, including medical testing and monitoring of individuals exposed to releases of radioactive iodine. The defendants moved to have the HDC's claim dismissed under Fed.R.Civ.P. 12(b)(1) and 12(b)(6) based on CERCLA's Timing of Review provision, which prohibits federal courts from exercising jurisdiction over legal challenges to CERCLA "removal" or "remedial" activity. *See* 42 U.S.C. § 9613(h). Defendants contend that ATSDR health assessment and surveillance activity satisfies the statutory definition of removal action, and thus is entitled to the jurisdictional protection of the Timing of Review provision.

The district court granted the defendants' motion to dismiss. The court held that as a threshold matter, the ATSDR's health related actions at Hanford are properly classified as CERCLA "removal or remedial" activities, and thus the HDC's suit could be subject to CERCLA's Timing of Review provision. The district court then determined that because the HDC's suit challenged ongoing, discretionary ATSDR removal actions, all of § 9613(h)'s requirements had been met and the court had no jurisdiction over the HDC's claims.

The plaintiffs appeal the district court's decision on several grounds. First, the plaintiffs contend that the ATSDR health assessment and surveillance activities are not "removal or remedial" actions, and thus the Timing of Review provision does not apply to the HDC's suit. The plaintiffs also assert that even if ATSDR health assessment and surveillance activity is generally entitled to § 9613(h) protection, two specific § 9613(h) requirements have not been satisfied in this case. The HDC argues first that it is not "challenging" the ATSDR's health assessment and surveillance authorities, and thus § 9613(h) does not apply, and second that the initiation of a health surveillance program is *required* at Hanford, and § 9613(h) protects only discretionary action.

The HDC also argues that even if the ATSDR's health assessment and surveillance activities satisfy the requirements of the Timing of Review provision, the ATSDR has completed its health assessment activities at Hanford, and thus its suit qualifies for the § 9613(h)(4) "citizen suit" exception. Finally, the plaintiffs assert that application of the Timing of Review's jurisdictional proscription to their claims constitutes a denial of due process.

## II. STATUTORY FRAMEWORK

### A. *CERCLA*

Congress enacted CERCLA, 42 U.S.C. §§ 9601–9675 (1988 & Supp. V 1993), *amended by* the 1986 Superfund Amendments and

---

**5.** Each of these meetings spanned a two day period. *See* 60 Fed.Reg. 35750–01 (July 27–28, 1995 meeting in Pasco, Washington); 60 Fed. Reg. 19263–02 (May 15–16, 1995 meeting in Portland); 60 Fed.Reg. 12769–01 (March 16–17, 1995 meeting in Spokane). In addition to the ATSDR, the Center for Disease Control and the Hanford Health Effects Subcommittee of the Citizens Advisory Committee on Public Health Service Activities and Research at Department of Energy Sites participated in each meeting. *Id.* The meetings were open to the public. *Id.* The public notices regarding each meeting announced that "Agenda items include ATSDR's medical monitoring options, ATSDR's planning for a medical assistance program, [and] current health assessment activities." 60 FR 35750–01 (Pasco); *see also* 60 Fed.Reg. 19263–02; 60 Fed. Reg. 12769–01.

Reauthorization Act (SARA), Pub.L. No. 99–499, 100 Stat. 1613 (1986), " 'to protect and preserve public health and the environment' " by facilitating the expeditious and efficient cleanup of hazardous waste sites. *Wilshire Westwood Assoc. v. Atlantic Richfield,* 881 F.2d 801, 804 (9th Cir.1989) (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir.1986)). To ensure that cleanup efforts would not be delayed by litigation, Congress included in CERCLA a Timing of Review provision. The provision, codified at 42 U.S.C. § 9613(h), prevents federal courts from exercising jurisdiction over legal challenges to ongoing CERCLA "removal" or "remedial" activity. Section 9613(h) provides in pertinent part:

> No Federal court shall have jurisdiction under federal law other than under section 1332 of Title 28 .... or under state law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any *challenges to removal or remedial action selected under section 9604....*

42 U.S.C. § 9613(h) (emphasis added). Thus, once an activity has been classified as a CERCLA § 9604 removal or remedial action, § 9613(h) " 'amounts to a blunt withdrawal of federal jurisdiction.' " *McClellan Ecological Seepage Situation v. Perry,* 47 F.3d 325, 328 (9th Cir.) (quoting *North Shore Gas Co. v. Perry,* 930 F.2d 1239, 1244 (7th Cir.1991)), *cert. denied,* —— U.S. ——, 116 S.Ct. 51, 133 L.Ed.2d 16 (1995).[6]

CERCLA-related activities may qualify as removal or remedial actions in at least three ways. First, Congress may have specifically designated an action as a removal or remedial activity. *See, e.g.,* 42 U.S.C. § 9601(23) (listing examples of removal activity); 42

U.S.C. § 9601(24) (listing examples of remedial actions). Second, cleanup activity explicitly classified in CERCLA as a "response" to a Superfund site is, by definition, a removal or remedial action. *See* 42 U.S.C. § 9601(25) (defining "response" as a "removal ... [or] remedial action"). Finally, even if action taken at a CERCLA site is not referred to in the statute as a removal or remedial action or a response action, the Timing of Review provision will still apply if the action satisfies CERCLA's definition of "removal" or "remedial."[7]

## B. *The ATSDR's Statutory Role*

Congress created the ATSDR in 1980 as part of CERCLA, and significantly expanded the ATSDR's role as part of the 1986 Superfund Amendments ("SARA"). Congress gave the Agency the responsibility to "effectuate and implement [CERCLA's] health related authorities." 42 U.S.C. § 9604(i)(1). Among those authorities is a requirement that the ATSDR complete a "health assessment" within one year of an EPA proposal to list a site on the NPL. *See* 42 U.S.C. § 9604(i)(6)(A). The purpose of the health assessment is to help determine "whether actions ... should be taken to reduce human exposure to hazardous substances from a facility and whether additional information on human exposure and associated health risks is needed and should be acquired by conducting epidemiological studies ..., establishing a health surveillance program ..., or through other means." 42 U.S.C. § 9604(i)(6)(G). Only if the ATSDR Administrator determines that "there is a significant increased risk of adverse health effects in humans from exposure to hazardous substances based on the results of a health

---

6. Section 9613(h) includes five exceptions, none of which apply here.

7. Removal activity is defined as

 the cleanup or removal of released hazardous substances from the environment, [and] such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of other such actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may other-

wise result from the release or threat of release.

42 U.S.C. § 9601(23). Remedial actions are defined in pertinent part as

those actions consistent with permanent remedy taken instead of or in addition to removal actions ... The term includes, but is not limited to ... any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

42 U.S.C. § 9601(24).

assessment" must the ATSDR initiate a health surveillance program. 42 U.S.C. § 9604(i)(9). Once initiated, the program must include both periodic medical testing to screen the exposed population for disease and a mechanism to refer for treatment anyone who needs medical attention. 42 U.S.C. § 9604(i)(9)(A), (B).

## III. STANDARD OF REVIEW

■■■ The interpretation of a statute is a question of law reviewed de novo. *See Forest Conservation Council v. Rosboro Lumber Co.,* 50 F.3d 781, 783 (9th Cir.1995). The lower court's determination of subject matter jurisdiction is a question of law and is reviewed de novo. *See Nike, Inc. v. Comercial Iberica De Exclusivas,* 20 F.3d 987, 990 (9th Cir.1994). A dismissal for failure to state a claim is also a question of law and is reviewed de novo. *See Stone v. Travelers Corp.,* 58 F.3d 434, 436–37 (9th Cir.1995). All of the district court's factual findings on jurisdictional issues must be accepted as true unless clearly erroneous. *See id.*

## IV. DISCUSSION

### A. *ATSDR Activity at Hanford as Removal or Remedial Action*

The HDC argues that ATSDR health assessment and surveillance activity at Hanford is not properly classified as "removal or remedial action" under CERCLA, and thus the district court erred in dismissing its action pursuant to CERCLA's Timing of Review provision. The HDC's interpretation of removal or remedial action is supported, plaintiffs contend, by an examination of the statutory language, a purposive reading of the statutory structure, and fidelity to CERCLA's purpose. We find that the language, structure, and purpose of CERCLA support the conclusion that ATSDR health assessment and surveillance activity at Hanford is removal or remedial action entitled to the protection of § 9613(h).

#### 1. The Language of § 9604

##### a. ATSDR Activities as Response Authorities

Plaintiffs appropriately begin their analysis with the language of the statute. *See*

*Pierce v. Underwood,* 487 U.S. 552, 559, 108 S.Ct. 2541, 2547, 101 L.Ed.2d 490 (1988) (instructing that in applying statutes courts should "turn first to the language and structure" of the relevant statute); *Stanton Road Associates v. Lohrey Enterprises,* 984 F.2d 1015, 1019 (9th Cir.) (applying rule to interpretation of CERCLA), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 652, 126 L.Ed.2d 609 (1993). Plaintiffs note that Congress instructed the ATSDR to "effectuate and implement the *health related authorities*" of CERCLA. 42 U.S.C. § 9604(i)(1) (emphasis added). The HDC argues that when Congress characterized the ATSDR's responsibilities as "health related authorities," it meant to distinguish them from § 9604 "response authorities." Thus, the HDC concludes, because ATSDR activities are distinguished from response authorities, and response authorities are defined as removal or remedial actions, ATSDR activities are not removal or remedial actions.

■■■ Plaintiffs' reading of the statute impermissibly isolates and extracts statutory language that must be read in context. Indeed, "[w]hen we look to the plain language of a statute in order to interpret its meaning, we do more than view words or sub-sections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole." *In re Rufener Constr., Inc.,* 53 F.3d 1064, 1067 (9th Cir.1995). Part of that context is the title of the section in which the relevant language appears. *See Greyhound Corp. v. United States,* 495 F.2d 863, 868 (9th Cir.1974) (noting that statutory titles can be "very useful tool[s]" in resolving the ambiguity); *see also Oregon Pub. Util. Comm'n v. I.C.C.,* 979 F.2d 778, 780 (9th Cir.1992) (noting that although section title may not control the plain meaning of a statute, the title "can be used to resolve ambiguity"); *United States v. Cha,* 837 F.2d 392, 394 (9th Cir.1988) (same).

■■■ In this case, the language cited by plaintiffs appears within § 9604, which is entitled "[r]esponse authorities." 42 U.S.C. § 9604. Thus, Congress characterized the ATSDR health assessment and surveillance

authorities found in § 9604 as both "response authorities" and as "health related authorities." We now turn to a discussion of congressional intent.

Reading the § 9604 "health related authorities" language cited by plaintiffs in conjunction with § 9604's heading rather than in isolation indicates that, at the very least, Congress did not intend to distinguish ATSDR activities from other CERCLA response authorities. There is no indication that Congress' characterization of ATSDR authorities as "health related" was intended to render the § 9604 "response authorities" section heading superfluous as to ATSDR actions. Instead, the most natural reading of the two statutory provisions is that the ATSDR's health related authorities are, in effect, a subset of a broader set of CERCLA response authorities. Thus, because Congress gave no indication that the universe of CERCLA response authorities cannot include both the health and non-health related activities found in § 9604, we begin with the presumption that Congress did not intend to nullify § 9604's "response authorities" heading by describing the ATSDR's authorities as "health related."

This presumption is strengthened here because the ATSDR health assessment and surveillance actions are not the only health related authorities found within § 9604. Indeed, Congress not only included provisions relating to the public health in other § 9604 subsections, but also specifically characterized actions taken to effectuate other public health authorities as "response measures." In § 9604(a)(1), Congress provided that the President may "take any other response measure ... necessary to protect the public health or welfare or environment." 42 U.S.C. § 9604(a)(1); *see also* 42 U.S.C.

§ 9604(b)(1) (authorizing President to begin health assessment and surveillance activities whenever President believes public health is threatened). Thus, Congress clearly did not believe actions taken to secure the public health were different in kind from "response authorities" contained in § 9604. Rather, Congress envisioned situations in which the President would have to take "response measure[s]," which would almost certainly include health assessment and surveillance activity, to "protect the public health." [8] In sum, we find that Congress' single reference to ATSDR authorities as "health related" should be read narrowly as a means to distinguish between different types of response authorities, rather than interpreted broadly as an effort to differentiate ATSDR health assessment and surveillance activity from response actions protected by the Timing of Review provision.

However, we do not hold that all CERCLA activities found under § 9604's "response authorities" heading are per se removal or remedial actions for purposes of CERCLA's Timing of Review provision. In some instances, giving § 9604's "response authorities" heading binding effect would be inconsistent with § 9601's definition of removal or remedial action, or would conflict with CERCLA's remedial purposes.[9] Moreover, the application of a provision stripping the federal courts of jurisdiction must rest on more than the thin reed of a section heading. Accordingly, we turn to an examination of whether the ATSDR's health assessment and surveillance activities, which are presumptively "response authorities" by virtue of their position within § 9604, independently satisfy CERCLA's definition of removal or remedial activity.

8. HDC contends that because some earlier versions of the 1986 amendments to CERCLA placed ATSDR provisions outside of § 9604 altogether, that Congress clearly intended to distinguish ATSDR's health related functions from the other removal and remedial activities found under § 9604's "Response authorities" heading. We must, however, decline the invitation to hold that Congress' decision to associate ATSDR authorities with other response authorities actually evinces an intent to keep the ATSDR activities separate from response actions.

9. Indeed, the government concedes that not all of the ATSDR's § 9604 responsibilities are response actions. The government acknowledges, for instance, that "the conduct of ATSDR's 'general' duties, such as maintenance of various [health related] registries and inventories ..., ordinarily would not constitute response *actions.*"

b. ATSDR Activities and the Definition of "Removal Action" [10]

■ CERCLA defines removal actions as measures "necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances ... or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare." 42 U.S.C. § 9601(23). We hold that the ATSDR health assessment and surveillance activities at Hanford satisfy the definition of removal action.

A plain reading of the statute supports the conclusion that the ATSDR health assessment and surveillance activities at issue in this case fall within the statutory definition of removal actions. "Removal action" under the statute includes those activities that are deemed necessary to prevent hazardous releases from adversely affecting the public health. The ATSDR health assessment and surveillance activities challenged by the HDC, in turn, are a necessary part of the government's efforts to safeguard the public health at NPL sites. The ATSDR is responsible not only for assessing whether the health surveillance program sought by the HDC is appropriate at Hanford, but also must coordinate its efforts with other federal agencies to facilitate a cleanup that most effectively protects the health of those exposed to hazardous materials. The ATSDR's involvement at Hanford is mandated by CERCLA, and no other federal agency is responsible for evaluating what action should be taken in response to the historical releases of radioactive iodine at Hanford. The

ATSDR, in short, is an integral part of Congress' effort to protect the health of those exposed to hazardous releases from facilities listed on the NPL.

We have held, however, that the definition of "removal" does not encompass all activity related to protecting the public health from hazardous releases. In *Durfey v. E.I. DuPont De Nemours Co.*, 59 F.3d 121 (9th Cir.1995), and *Price v. United States Navy*, 39 F.3d 1011 (9th Cir.1994), we held that *private party* medical monitoring activities, initiated and coordinated independently of ongoing CERCLA cleanup efforts, were not § 9601 removal or remedial actions.[11] In each case, we held that excluding private medical monitoring programs from CERCLA's definition of removal actions was appropriate for two reasons.[12] First, we distinguished private medical monitoring programs from the five examples of removal actions provided by Congress in § 9601(23), noting that those examples principally concern the threats posed by the physical removal of hazardous waste rather than medical monitoring of the long-term health effects of past hazardous releases. See *Durfey*, 59 F.3d at 125 (quoting *Price*). Second, we determined that the relevant legislative history evinced a clear congressional intent to exclude private medical monitoring activity from CERCLA. See *id.*

The reasoning in *Durfey* and *Price* does not apply to health assessment and surveillance actions engaged in by a governmental agency pursuant to explicit CERCLA provisions. A careful examination of the specific examples of removal actions provided by

10. Although we focus our discussion on CERCLA's definition of "removal," our analysis is equally applicable (with the exception of our discussion of the specific examples of removal actions provided by Congress) to CERCLA's definition of "remedial." However, because the ATSDR's health assessment and surveillance activities need only be removal *or* remedial action to gain the protection of § 9613(h), we need not make a separate "remedial" action determination.

11. In *Durfey* and *Price,* the issue was whether private medical monitoring expenses were "response costs" recoverable under CERCLA § 9611(a)(2). We noted that "response" is defined as removal or remedial action, and held

that private medical monitoring programs were not removal actions under § 9601(23) or remedial actions under § 9601(24). *See, e.g., Durfey,* 59 F.3d at 125. Thus, we concluded, program expenses were not "response costs." *Id.*

12. We also noted in *Durfey* and *Price* that Congress separated the recovery of the costs of ATSDR health assessment and surveillance activities from the recovery of other government "response costs," and concluded that this was one indication of a congressional intent to differentiate between medical monitoring and response actions. *See, e.g., Durfey,* 59 F.3d at 125 (citing *Price* ). We address this point below in our discussion of CERCLA's statutory structure.

Congress convinces us that ATSDR health assessment and surveillance activities are within the scope of § 9601(23).[13] Among the examples of removal action cited in the statute is any "action taken under section 9604(b)." 42 U.S.C. § 9601(23). Section 9604(b), in turn, provides that the President may act whenever there is reason to believe that

> a release has occurred ..., or that illness, disease, or complaints thereof may be attributable to exposure to a hazardous substance ... he may undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary or appropriate to identify ... the extent of danger to the public health or welfare.

42 U.S.C. § 9604(b)(1). This example of removal activity differs from the ATSDR's health related authorities in only one notable respect: the President rather than the ATSDR is taking the action. Even if we felt this difference was material, which we do not, it is significantly diminished because the President subsequently delegated these functions to the ATSDR. *See* Exec.Order No. 12580, § 2(a), 52 Fed.Reg. 2923 (Jan. 23, 1987), *amended by* Exec.Order No. 12777, § 1(a), 56 Fed.Reg. 54757 (Oct. 18, 1991), *reprinted as amended in* 42 U.S.C. § 9615 (Historical and Statutory Notes).[14] Furthermore, the President was not the first to recognize the functional link between the President's health related authorities and the activities of the ATSDR. Congress provided in § 9604(i) that:

> [I]f a health assessment or other study carried out [by the ATSDR] contains a finding that the exposure concerned presents a significant risk to human health, the President shall take such steps as may be necessary to reduce such exposure and

eliminate or substantially mitigate the significant risk to human health.

42 U.S.C. § 9604(i)(11).

Clearly, Congress did not believe that health assessment and surveillance activity pursued as part of the *government's* response to past or present hazardous releases fell outside the statute's definition of "removal action." Rather, by explicitly including the President's § 9604(b)(1) health related responsibilities within the scope of § 9601(23), Congress demonstrated that it considered identifying and ameliorating the public health effects of hazardous releases to be among CERCLA's core removal functions. Moreover, because the ATSDR health assessment and surveillance activities are inextricably linked to the President's responsibilities by both executive order and the plain language of § 9604(i)(11) we hold that the ATSDR's health assessment and surveillance authorities also satisfy § 9601(23)'s definition of removal action.

Our interpretation of the scope of CERCLA removal actions is rooted in the distinction Congress drew between public and private efforts to monitor the public health. Congress expanded the role of the ATSDR as part of the 1986 Amendments to CERCLA specifically to address concerns that the original Act had not done enough to "monitor, assess, and evaluate" the public health effects of hazardous releases:

> During the reauthorization debates that resulted in the passage of the SARA amendments to CERCLA, one prominent issue addressed by Congress was the need to better define the health risks presented by hazardous waste sites. There was substantial sentiment in both houses of Congress that inadequate attention had been given to the health effects of contaminants

---

**13.** § 9601(23) provides that the scope of "removal action" is not limited to the examples provided in the sub-section. Thus, these examples serve only as a guide to what activities may appropriately be classified as "removal action."

**14.** The order reads:
The functions vested in the President by ... Section [9604(b)(1)] of the Act ... relating to 'illness, disease, or complaints thereof' are delegated to the Secretary of Health and Human

Services who shall, in accord with Section [9604(i)] of the Act ... perform those functions through the Public Health Service. Exec.Order No. 12580, § 2(a). § 9604(i) of the Act contains all the substantive provisions relating to the ATSDR's responsibilities, including the health assessment and surveillance provisions. The ATSDR was created by Congress within the Public Health Service. *See* 42 U.S.C. § 9604(i)(1).

found at Superfund sites, as well as the risks to local residents posed by hazardous waste sites. To remedy the perceived inadequacies of the 1980 enactment, Congress created an expanded role for the [ATSDR] to provide medical examinations and testing of exposed individuals.

*Ambrogi v. Gould, Inc.*, 750 F.Supp. 1233, 1249 (M.D.Pa.1990); *see also* 4 William H. Rodgers, Jr., *Environmental Law: Hazardous Wastes and Substances*, § 8.2, at 482 (1992) (noting that ATSDR health assessment provisions were meant to address the failure of the original Act to adequately protect the public health). Congress clearly did not believe when it amended CERCLA in 1986 that the activities of the ATSDR bore an insignificant relationship to the physical cleanup of CERCLA sites. Rather, Congress meant to codify its understanding, gained through six years of experience with the operation of CERCLA, that Superfund removal and remedial activity must include an effective public health component.

Congress' decision to expand the role government health assessment and surveillance activity would play at CERCLA sites stands in stark contrast to Congress' treatment of *private* medical monitoring programs. As we noted in both *Durfey* and *Price*, "Congress intentionally deleted all personal rights to recovery of medical expenses from CERCLA." *Durfey*, 59 F.3d at 125 (quoting *Price*, 39 F.3d at 1017 (quoting *Daigle v. Shell Oil*, 972 F.2d 1527, 1536–37 (10th Cir.1992))); *see also Daigle*, 972 F.2d at 1537 ("The deleted provisions, however, dealt with a personal right of recovery for medical expenses, not the comprehensive ATSDR health assessment procedures enacted under the 1986 SARA Amendments."). Congress omitted the recovery of private medical monitoring costs from CERCLA based on a determination that CERCLA was not a proper vehicle for facilitating either private medical monitoring efforts or the toxic tort actions that often accompany such efforts. *See Ambrogi*, 750 F.Supp. at 1238 ("In passing [CERCLA] ... Congress did not intend to make injured parties whole or to create a general vehicle for toxic tort actions.").

We believe the language of CERCLA, supported by a close examination of the relevant legislative history, establishes that the ATSDR health assessment and surveillance activities at NPL sites are removal actions, and thus are eligible for § 9613(h)'s jurisdictional protection.

### 2. CERCLA's Statutory Structure

#### a. Sections 9607(a)(4)(A) and 9607(a)(4)(D)

 Plaintiffs argue that the structure of two CERCLA subsections proves that Congress did not believe ATSDR health assessment and surveillance activities were response authorities or removal actions. The HDC argues that § 9607(a)(4)(A), which provides for the recovery of "all costs of removal or remedial action incurred by the United States Government," is separate from § 9607(a)(4)(D), which provides for the recovery of "the costs of any health assessment or health effects study carried out" by the ATSDR. As a result, they argue that Congress must have generally intended to distinguish ATSDR activities from removal or remedial action. We disagree with the HDC's conclusion.

It bears noting that the ATSDR provision in § 9607(a)(4)(D) was added to CERCLA's original § 9607(a)(4) (which included § 9607(a)(4)(A)) as part of the 1986 Superfund Amendments. Thus, we decline to read the failure of Congress to accomplish the seamless integration of ATSDR provisions with the other response authorities found under sub-section 9607(a)(4) as compelling proof of Congress' intent to distinguish ATSDR activities from removal and remedial actions. *See Clark v. Uebersee Finanz–Korporation*, 332 U.S. 480, 488, 68 S.Ct. 174, 177, 92 L.Ed. 88 (1947) (noting that court should not adopt an interpretation of statutory language that would "run counter to the policy of the Act and be disruptive of its purpose ... [when] dealing with hasty legislation that Congress did not stop to perfect as an integrated whole."); *Callejas v. McMahon*, 750 F.2d 729, 731 (9th Cir.1985) (noting that when considering an Act that has been amended "[i]t is the duty of a court to consider the time and circumstances surrounding the enactment"); *see also* Rodgers, § 8.2, at

485 (noting that one consequence of the "conglomerate origins and features of SARA is a loss of coherence, because the law was not designed by a single intelligence or the meeting of a few minds"). Nevertheless, there is at least a question raised as to what Congress intended when it added an autonomous ATSDR cost-recovery provision to sub-section 9607(a)(4). Since the statutory structure gives rise to ambiguity, "we consult the legislative history, to the extent that it is of value, to aid in our interpretation." *Straub v. A P Green, Inc.*, 38 F.3d 448, 452 (9th Cir.1994).

An examination of the legislative history reveals a clear congressional intent to identify at least some costs related to ATSDR health activities as "response costs." The separate House and Senate versions of the SARA Amendments each provided that "[i]n any case in which a health assessment ... discloses the exposure of a population to the release of a hazardous substance or pollutant or contaminant from a facility, the costs of such health assessment may be recovered as a cost of response under section [9607] of [CERCLA]." H.R. 2817, 99th Cong., 2d Sess. § 116(f)(10) (1986); S. 51, 99th Cong., 2d Sess. § 116(i)(3)(G) (1986) (Senate version); *see also* Joint Explanatory Statement of the Committee of Conference, *reprinted in* 1986 U.S.C.C.A.N. 3276, at 3302, 3304 (noting that both House and Senate bills provide that "the costs of performing a health assessment may be recovered as a cost of response under the authority of section [9607] of this Act, where the assessment discloses exposure of a population to a release of a hazardous substance from a facility"). Congress intended the final version of the Amendments to codify the House and Senate cost-recovery provisions:

> The conference substitute [for the House and Senate ATSDR cost-recovery provisions] deletes the authority for recovery of costs associated with the performance of health assessments in both the House and Senate amendments, since *that authority is covered* in the conference substitute's amendments to section [9607] of the current law.

Joint Explanatory Statement of the Committee of Conference, *reprinted in* 1986

U.S.C.C.A.N. at 3306 (emphasis added). Thus, rather than establishing that Congress meant to distinguish ATSDR activities from response actions by amending CERCLA to include a separate ATSDR cost-recovery provision, the legislative history demonstrates that the House and the Senate agreed that at least some ATSDR health assessment activities were, in fact, response actions. The statutory structure of § 9607(a)(4)(A) and (D) does not evince Congress' intent to exclude the ATSDR's § 9604 health related authorities from CERCLA's definition of response action.

### b. Sections 9611(a) and 9611(c)

HDC asserts that the structure of § 9611(a) and (c) provides another indication that Congress did not intend ATSDR activities to be classified as removal or remedial actions. In those subsections, Congress again separately addressed governmental response costs and ATSDR-related costs. *Compare* 42 U.S.C. § 9611(a)(1) (addressing governmental response costs) *with* 42 U.S.C. § 9611(c) (addressing ATSDR costs). Congress did not indicate in the legislative history what, if anything, it intended to convey by amending § 9611 to include a separate ATSDR provision. Thus, given the statute's structural ambiguity and the absence of congressional guidance regarding the proper interpretation of § 9611 as it relates to the classification of ATSDR activities as response actions, this court must choose the interpretation that is most consistent with the remainder of the Act. *See Brooks v. Donovan*, 699 F.2d 1010, 1011 (9th Cir.1983) (noting that court must confirm that its interpretation does not "'thwart the purpose of the overall statutory scheme or lead to an absurd result.'") (citations omitted); *see also Wilshire Westwood Assoc.*, 881 F.2d at 804 (applying *Brooks* in CERCLA context). We hold, notwithstanding the structural ambiguities highlighted by plaintiffs, classifying ATSDR health assessment and surveillance activities at NPL sites as removal action is most consistent with the overall structure and purpose of CERCLA.

### 3. CERCLA's Remedial Purpose

■ Concluding that the ATSDR's health assessment and surveillance activities fall within CERCLA's definition of removal activity, and thus are protected by the Timing of Review provision, is consistent with CERCLA's remedial purpose. Because " 'CERCLA is essentially a remedial statute designed by Congress to protect and preserve public health and the environment[, courts] are ... obligated to construe its provisions liberally to avoid frustration of the beneficial legislative purposes....' " *Wilshire Westwood Assoc.*, 881 F.2d at 804 (quoting *Dedham Water Co.*, 805 F.2d at 1081); *see also 3550 Stevens Creek Assoc. v. Barclays Bank*, 915 F.2d 1355, 1363 (9th Cir.1990) ("We agree that [CERCLA] is to be given a broad interpretation to accomplish its remedial goals."), *cert. denied*, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). We are convinced that classifying ATSDR's activities as removal or remedial activity is consistent with CERCLA's purposes for three reasons.

First, this circuit has joined others in recognizing that protection of the public health was one of the remedial goals of CERCLA. *See Wilshire Westwood Assoc.*, 881 F.2d at 804; *Dedham Water Co.*, 805 F.2d at 1081. More specifically, as we noted above, the health related authorities assigned to the ATSDR in 1986 were meant to redress perceived weaknesses in CERCLA's public health provisions. Given that Congress strengthened the ATSDR in hopes of better achieving CERCLA's remedial goal of protecting the public health, it follows that we must construe provisions relating to the ATSDR in a manner that is most likely to facilitate the effective performance of its statutory responsibilities. We believe that the ATSDR can most effectively protect the public health if the Agency receives the same protection from legal attack that is already extended to other CERCLA removal and remedial activity pursuant to CERCLA's Timing of Review provision.

Second, as we noted above, CERCLA affords a privileged position to *governmental* cleanup efforts as opposed to the efforts of private parties. Indeed, even the cost-recovery provisions relied upon by plaintiffs generally privilege government efforts to recover response costs over similar claims pressed by private parties. *See, e.g., Washington State Dep't of Transp. v. Washington Natural Gas*, 51 F.3d 1489, 1495–96 (9th Cir.1995) (noting that § 9611(a) distinguishes the government's response cost recovery actions from similar actions brought by private parties and reviewing the more deferential legal standard applied to the government); *see also* Rodgers, § 8.14, at 702 ("In ... noticeable particulars, the government has an easier time than private parties in pursuit of response costs."). Moreover, as we noted in our discussion of *Durfey* and *Price*, Congress specifically chose to increase the authority of the ATSDR while intentionally omitting any provisions that would link the administration of CERCLA to private medical monitoring efforts. In short, we are convinced that granting jurisdictional protection to ATSDR activities is most consistent with Congress' intent to give government cleanup efforts wide latitude.

Most importantly, recognizing that the ATSDR actions at Hanford constitute removal or remedial action is most consistent with the role Congress intended the ATSDR to play within CERCLA. ATSDR health assessment and surveillance provisions were added to CERCLA due to congressional concern that government response efforts had not given enough attention to the effects hazardous materials were having on human health. *See Ambrogi*, 750 F.Supp. at 1249. To address this concern, the ATSDR was assigned a role to play at every NPL site, *see* 42 U.S.C. § 9604(i)(6)(A), and is expected to continually evaluate the appropriate responses to health-related problems the Agency identifies at each site. *See* 42 U.S.C. § 9604(i)(6)(G) ("The purpose of health assessments ... shall be to assist in determining whether actions ... should be taken to reduce human exposure to hazardous substances from a facility and whether additional information on human exposure and associated health risks is needed."). The ATSDR is required to assist the EPA, Department of Energy, the Centers for Disease Control, and other federal, state, and local authorities

with the implementation of health related provisions of CERCLA, *see* 42 U.S.C. § 9604(i)(1). This requirement is reinforced at Hanford by the inclusion of ATSDR in the FFA, the blueprint for Hanford's interagency cleanup effort. *See Heart of America Northwest v. Westinghouse Hanford,* 820 F.Supp. 1265, 1283 (E.D.Wash.1993) ("[T]he [Hanford] FFA is an integrated CERCLA response plan and that the activities undertaken pursuant to the FFA are remedial actions selected under CERCLA section 104 and 120."). The ATSDR also must coordinate its activities with the President's response authorities in the event immediate threats to public health are identified. *See* 42 U.S.C. § 9604(i)(11). We hold that the clear and extensive congressional efforts to integrate ATSDR health assessment and surveillance action into NPL cleanups support the conclusion that the activities at issue in this case fall within the scope of § 9613(h)'s jurisdictional proscription.

Because the ATSDR's health assessment and surveillance activities are "removal or remedial actions" under § 9613(h),[15] we conclude that HDC's suit may be subject to CERCLA's Timing of Review provision. Plaintiffs argue, however, that even if the ATSDR health assessment and surveillance activity may be entitled in some instances to § 9613(h) protection, several specific § 9613(h) requirements have not been met in this case. HDC asserts that: (1) it is not "challenging" the ATSDR's health assessment and surveillance authorities, and thus § 9613(h) does not apply; (2) the initiation of a health surveillance program is *required* at Hanford, and § 9613(h) protects only discretionary action; and (3) the ATSDR has "taken" health assessment action, and thus its suit should be allowed to proceed under the "citizen suit" exception to § 9613(h). We examine each of these arguments in turn.

### B. Plaintiffs' Suit as a "Challenge" to ATSDR Activity

■ Section 9613(h) denies jurisdiction to federal courts only if a removal or remedial action is "challenged" by plaintiffs. *See* 42 U.S.C. § 9613(h). Plaintiffs contend that even if ATSDR activities at Hanford are removal or remedial actions, their claim for injunctive relief does not constitute a challenge to those activities. The district court held that HDC's suit did challenge ongoing response actions at Hanford and thus was subject to § 9613(h)'s jurisdictional bar. We agree.

A straightforward application of our precedent disposes of plaintiffs' claim. We held in *Razore v. Tulalip Tribes,* 66 F.3d 236 (9th Cir.1995), that "[a]n action constitutes a challenge if it is related to the goals of the cleanup." *Id.* at 239; *see also McClellan,* 47 F.3d at 330 (holding that lawsuits that are "directly related to the goals of the cleanup" are challenges to removal actions and thus are barred by § 9613(h)). Moreover, injunctive relief that "for all practical purposes, seeks to improve on the CERCLA cleanup as embodied in the Interagency Agreement ... qualifies as a 'challenge' to the cleanup." *McClellan,* 47 F.3d at 330. HDC's request for injunctive relief in this case, while well-intentioned, amounts to an effort to read into CERCLA and the Hanford FFA a duty to initiate a health surveillance program at plaintiffs' request. As such, it clearly constitutes a challenge under *McClellan* to the federal government's continuing response activity at Hanford and thus is subject to § 9613(h)'s jurisdictional proscription.

### C. ATSDR Activities at Hanford as "Selected"

■ HDC asserts that even if its citizen suit is considered a challenge to the ATSDR's response activities, HDC is not challenging a "selected" activity and thus is not barred from bringing suit. *See* 42 U.S.C. § 9613(h) (barring any challenge to "removal or remedial action selected under § 9604"). Plaintiffs argue that initiation of a medical monitoring program at Hanford is statutorily

---

**15.** The only federal court to explicitly address whether ATSDR health assessment activities are removal or remedial actions reached the same conclusion we reach today. *See Environmental Waste Control v. ATSDR,* 763 F.Supp. 1576, 1580 (N.D.Ga.1991) (holding that ATSDR health assessment activities are removal or remedial actions and thus are protected by § 9613(h)'s jurisdictional bar).

mandated, and thus not a discretionary measure "selected" by the ATSDR. We disagree.

Section 9604(i)(9) provides that "[w]here the Administrator of ATSDR has determined that there is a significant increased risk of adverse health effects in humans from exposure to hazardous substances ... the Administrator of ATSDR shall initiate a health surveillance program for such population." Thus, as we noted in *Durfey*, "the ATSDR is only required to administer a 'health surveillance' (medical monitoring) program *if* the ATSDR Administrator has determined that there is a significantly increased risk for an affected population." *Durfey*, 59 F.3d at 125. The ATSDR has not made any determination concerning the "increased risk of adverse health effects" at Hanford.[16] Although the HDC believes such a determination is warranted at this time, we defer to the expertise and discretion of the ATSDR regarding the appropriateness of beginning a health surveillance program. *See Washington State Dept. of Transp.*, 51 F.3d at 1497 ("because determining the appropriate removal and remedial action involves specialized knowledge and expertise, the choice of a particular cleanup method is a matter within the discretion of the [government]") (internal quotation marks and citations omitted); *see also In re Hanford Nuclear Reservation Litig.*, 780 F.Supp. 1551, 1565 (E.D.Wash.1991) ("[D]eterminations as to the health effects of releases of hazardous substances from the Hanford site ... are, by statute, matters within the exclusive province of [the ATSDR].").Until the ATSDR makes a § 9604(i)(7)(B)(9) determination, the decision to begin a health surveillance program lies within its discretion. CERCLA's Timing of Review provision prevents federal courts from interfering with that discretion.

### D. *ATSDR's Hanford Activities As "Taken" For Purposes of CERCLA's Citizen Suit Provision*

■■■ Section 9613(h) contains an exception providing that federal district courts

have jurisdiction over "citizen suits alleging that the removal or remedial action *taken* under § 9604 ... was in violation of any requirement of this chapter." 42 U.S.C. § 9613(h)(4) (emphasis added).Plaintiffs argue that the ATSDR's health assessments at Hanford constitute action "taken," and thus their claim for injunctive relief should be allowed to go forward.The district court, however, concluded that ATSDR's "health assessments are not really separable from the whole of the removal action at issue." *Hanford Downwinders Coalition, Inc.*, 841 F.Supp. at 1060.We agree.

The *McClellan* court effectively summarized why citizen suits brought under § 9613(h)(4) cannot escape § 9613(h)'s jurisdictional bar when cleanup activity is ongoing at a CERCLA site:

> Section [9613(h) ] protects the execution of a CERCLA plan *during its pendency* from lawsuits that might interfere with the expeditious cleanup effort.This results furthers the policy underlying CERCLA by allowing a quick response to serious hazards.Congress concluded that the need for such action was paramount, and that peripheral disputes, including those over "what measures actually are necessary to clean-up the site and remove the hazard," may not be brought while the cleanup is in progress.

*McClellan*, 47 F.3d at 329 (citations omitted). The cleanup at Hanford is clearly in its pendency.Not only do intra-agency and intra-governmental efforts to provide for the physical cleanup of the site continue, but the ATSDR also continues to monitor Hanford-related research, works with other governmental and non-governmental organizations involved in implementing the FFA Action Plan, and considers the initiation of medical surveillance programs.Although preliminary health assessments have been completed, those assessments have not yet been finalized.Thus, because the ATSDR has not yet "taken" action for purposes of CERCLA's citizen suit provision, § 9613(h) pre-

---

**16.** The thyroid disease study currently underway will be the first and, to this date, only study done at Hanford designed to determine whether radio-active releases at Hanford had an adverse impact on the health of those exposed.

vents the HDC from mounting legal challenges to the ATSDR's efforts.[17]

We conclude that the district court's application of § 9613(h) to HDC's suit was proper.

### E. Application of § 9613(h) and Due Process

 Plaintiffs contend that the application of § 9613(h) to their suit deprives them of due process of law by denying them "their day in court." We disagree.

We have held on more than one occasion that application of § 9613(h) is appropriate even if there is a possibility that plaintiffs' claims will never be heard in federal court. In *McClellan* the court recognized that:

> [T]he application of Section [9613(h)] may in some cases delay judicial review for years, if not permanently, and may result in irreparable harm to other important interests. Whatever its likelihood, such a possibility is for legislators, and not judges, to address. We must presume that Congress has already balanced all concerns....

*McClellan*, 47 F.3d at 329 (quoting *Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1023 (3d Cir.1991)); *see also Razore*, 66 F.3d at 239 (holding that courts "cannot ignore the clear mandate of section [9613(h)]" even if "there may never be a cleanup"). As the district court noted in its opinion, courts have consistently held that § 9613(h) does not give way even when human health is at issue. *See Hanford Downwinders Coalition, Inc.*, 841 F.Supp. at 1062 (collecting cases). Simply put, this court may not give the appellants "a day in court" to which they are not entitled.

### V. CONCLUSION

We recognize, as does the district court's opinion, that the application of CERCLA's Timing of Review provision may lead to seemingly harsh results. However, Congress determined that, on balance, the interests of the public are best served by allowing CERCLA cleanup activity to proceed without subjecting it to the inevitable delays resulting from even well-intentioned legal challenges. We may not disrupt that balance.

The decision of the district court is AFFIRMED.

---

**17.** The HDC appears to misconstrue the permissible scope of a citizen suit challenge to a completed response action. The HDC argues that "the provisions requiring the ATSDR to perform a health assessment for each NPL site and further requiring such assessments to be completed within one year must be viewed as action 'taken' and that the jurisdictional bar should not apply." The question of whether HDC could, if it desired, successfully bring a citizen suit challenge against the completed preliminary health assessments released by ATSDR in October 1990 is not before us. The completion of the preliminary health assessments, however, in no way allows HDC to interfere with ATSDR's *continuing* efforts to monitor the site, finalize the health assessments, and evaluate the need for a health surveillance program.